**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BRANDON HUDSON,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Civil Action Number** _____ |
| | ) | |
| **KIMBERLY M. FOXX,** | ) | **Judge** _____ |
| **COOK COUNTY, and** | ) | |
| **COOK COUNTY STATE'S** | ) | |
| **ATTORNEY'S OFFICE** | ) | |
| | ) | |
| *Defendants.* | ) | **Jury Trial Demanded** |

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Brandon Hudson ("Hudson" or the "Employee"), by and through his attorneys, Mason S. Cole of the law firm COLE SADKIN, LLC, and for his Complaint against Defendants, Cook County (the "County"), Cook County State's Attorney's Office (the "CCSAO"), and Kimberly M. Foxx, an Illinois resident, hereby states as follows:

### NATURE OF THE ACTION

1. Brandon Hudson served as a Cook County State's Attorney from June 29, 2015 through December 4, 2017. This suit is brought to secure the protection of, and to redress the deprivation of, rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, 42 U.S.C. § 1983, Government Employees Rights Act of 1991 (GERA), and under state law.

2. There is no other civil action between these parties arising out of the same transaction or occurrence as alleged herein pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a court of competent jurisdiction. This federal lawsuit, alleging race and gender discrimination, accompanied by

1

retaliatory discharge for reporting the same.

3.     Plaintiff requests actual, compensatory, and punitive damages, including back- and front-pay, along with redress for emotional harm, reasonable attorney's fees, mental anguish, pre-judgment and post-judgment interest at the legal rate, court costs, and such other and further relief, under law and in equity, to which Plaintiff is justly entitled.

## PARTIES

4.     Cook County is the municipality under which the Cook County State's Attorney's Office is housed.

5.     Defendant Cook County State's Attorney's Office is responsible for prosecuting crimes occurring within the County and to prosecute and defend civil actions filed on behalf of, or against, County officials.  *See* 55 ILCS 5/2-9005 (enumerating powers and duties of State's Attorneys).  The Office performs its functions through thirteen (13) offices located throughout Cook County, Illinois with its executive office located at 69 W. Washington Street, Chicago, Illinois 60603.  The Office is an employer within the definitions 29 U.S.C. § 630(b), and 42 U.S.C. § 2000(e)(b).

6.     Kimberly M. Foxx is the Cook County State's Attorney, holding this position during all times pertinent to this lawsuit.  Upon information and belief, she resides in Illinois.  Within her role as State's Attorney, her duties are to represent the office within Illinois.  Ms. Foxx was elected State's Attorney on November 8, 2016 and took office on December 1, 2016.

## JURISDICTION AND VENUE

7.      Jurisdiction of this Court is invoked pursuant to the provisions of 28 U.S.C. § 1331, 28 U.S.C. § 1343 (a)(3), 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 1988, and 42 U.S.C. § 12117.  The Defendants are all located in Cook County, Illinois.

8.      Venue is proper in this Court by virtue of 28 U.S.C. § 1391(b), because the cause of action arises out of events that took place in Cook County, Illinois.

9.      Plaintiff, Brandon Hudson, has met all administrative prerequisites to suit in that he filed a timely charge of discrimination against Defendants with the Equal Employment Opportunity Commission ("EEOC") as Charge Nos. 440-2018-05719 and 440-2018-05719[1], a copy of which is attached hereto and made a part of Plaintiff's **Exhibits 1 and 2.**  Plaintiff received a Right-to-Sue letter on or about September 28, 2018, a copy of which is attached hereto and made a part of Plaintiff's **Exhibit 3.**  Plaintiff brings this action within the limitations periods of 29 U.S.C. § 621 *et seq.*, 42 U.S.C. § 1981, 42 U.S.C. § 2000 *et seq*, 42 U.S.C. § 1983, Government Employees Rights Act of 1991 (GERA), and under state law.

---

[1] Note: Plaintiff named all three, above-captioned Defendants in his complaints with the EEOC; the EEOC only issued two charge numbers.

## STATEMENT OF FACTS

10.     Brandon Hudson is an African-American male.

11.     On or about June 29, 2015, Hudson was hired to work as an Assistant State's Attorney within the Criminal Appeals Division.  Hudson, after providing exceptional public service as documented in his performance evaluation, was subsequently promoted to the Juvenile Justice Division. Following a second performance review showing exceptional public service, Hudson's second transfer was to the Narcotics Prosecution Bureau–Felony Trial courtroom. While serving in the Narcotics Prosecution Bureau, Hudson was precariously transferred without fault or cause from the felony courtroom to a purely administrative function with the Alternative Prosecution and Sentencing Unit–a division under the Narcotics Prosecution Bureau.  Hudson's initial annual salary upon hiring was $59,340 and upon his termination was $64,199.20.

12.     Hudson's initial job duties included researching and writing appellate briefs, filing appellate briefs with the State of Illinois Appellate Court, and preparing civil and criminal cases for litigation, including any pre-trial motions.

13.     Hudson was an exemplary employee and never received any disciplinary actions during his employment with the Cook County State's Attorney other than a pre-textual, makeshift attempt to place Hudson on a performance-improvement plan ("PIP"), which failed to adhere any policy, procedure or plan for coaching and improvement.

14.     Despite Hudson's stellar results while working for the Cook County State's Attorney, including an Illinois Appellate Court publication and the opportunity to handle at least two media cases for the State's Attorney's Office, he was a frequent target of discrimination, bullying and harassment by his co-workers, supervisors, and members of management.

4

15.     On information and belief, from December 1, 2016 through October 22, 2018[2], the Cook County State's Attorney's Office suffered through drastic racial and gender disparity relating to disciplinary action:

A. One hundred percent (100%) of employees incurring disciplinary action (such as PIPs) are African-American or Hispanic;

B. Nineteen percent (19%) of employee terminations are for African-American employees, whereas the overall population of African-American employees employed by the Cook County State's Attorney is approximately eight percent (8%);

C. Thirty-nine percent (39%) of employee terminations are for male employees, whereas the overall population of male employees employed by the Cook County State's Attorney is twenty-eight percent (28%).[3]

D. The number of EEOC complaints by Assistant State's Attorney-employees with the CCSAO has risen significantly per year since 2012 to 2018, with two (2) complaints filed in 2012 and six (6) complaints filed in 2018.

<u>Initial Harassment of Brandon Hudson</u>

16.     Almost immediately after beginning his employment, Hudson became the target of verbal harassment and disparate treatment.

17.     On or around August 25, 2015 while Hudson was paired with Ashley Toro-Behncke, Toro-Behncke displayed visible disregard and frustration with Hudson for no apparent

---

[2] Presumably the statistics would be negligibly different currently, although this information will be gleaned by pending written discovery.
[3] Cook County State's Attorney began collecting information related to this disparity in September 2017 but failed to provide this information when requested by Plaintiff or the EEOC pursuant to Plaintiff's administrative Charge. Plaintiff is personally aware of the Cook County State's Attorney's collecting of this information because said data processing occurred while he was employed.

reason. This frustrated resulted in Toro-Behncke stating to Hudson, "How did you get this job. My friend is supposed to have your job and is supposed to be sitting in your seat."

18.     On or around the next day, August 26, 2015, Toro-Behncke engaged in conversation with Hudson regarding the 2015 Live Broadcast, Virginia Murders of Alison Parker and Adam Ward where Toro-Behncke attempted to illicit derogatory remarks from Hudson about the African-American murder suspect and where Toro-Behncke made biased, racist, and sexual comparisons between Hudson and the African-American male murder suspect who was alleged to be a successfully journalist who murdered two Caucasian colleagues during a live television broadcast for being passed over for a work promotion and accused of being gay by his colleagues.

19.     On or around the following day, August 27, 2015, Hudson's supervisors, Alan Spellberg, Michelle Katz, and Eric Leafblad called a meeting with Hudson based on unfounded allegations by Toro-Behncke that Hudson violated the State's Attorney's Employee Handbook, as an unspecified, baseless allegation, as an Assistant State's Attorney. The supervisors found this allegation to be false and moved Toro-Behncke across the hall from Hudson and later transferred Toro-Behncke to Rolling Meadows–one of the least desirable assignments amongst the CCSAO.

20.     On or around September 1, 2016, Assistant State's Attorney Mary Joly Stein filed an internal complaint within the State's Attorney's Office alleging Hudson was a hostile employee.  This comment was made in regards to a white female ASA, Bianca Pucci complaining of Hudson's courtroom demeanor and witnessed by court personnel and Judge. Hudson responded by asking Supervisor-Joly Stein to review the courtroom recordings and speak with courtroom staff to prove Hudson's innocence. Stein declined to investigate per

Hudson's request and transferred Hudson to another courtroom where Hudson continued to experience workplace harassment and discrimination.

21. Upon reassignment to a new court room, Hudson's first-chair under the supervision of Joly-Stein commented on Hudson size and stature stating, "You're a big guy. You could probably beat me up, take me in a fight."

22. On September 21, 2016, Hudson was assigned one of the oldest active cases in the Bureau, which had over 10,000 pages of discovery. Of note, neither Hudson's first-chair nor Supervisor Stein took ownership of the case prior to assigning to Hudson when faced with several persistent recommendations from the court and courtroom personnel. Hudson's courtroom first chair instructed Hudson stay late and work on the case, knowing it was Hudson's birthday. The first chair stayed to monitor Hudson's compliance until around 9:00 pm when the first chair left and sarcastically said "Oh, I forgot it was your birthday... happy birthday."

23. On November 29, 2016, just one week before one of Hudson's trials containing 10,000 pages and approximate 10 witnesses, Supervisor Joly-Stein and Division Chief Pernecke attempted to place Hudson on a pretextual, preemptive PIP. Hudson, whose performance was unquestionable exceeding expectations, was abruptly served a Memorandum from his new supervisors that contained unfounded allegations that his performance required improvement. Joly-Stein's and Pernecke's efforts were thwarted by the former Division Chief, Tisa Morris, following a review of Hudson's work and Hudson's 4-page response to Joly-Stein and Pernecke. Division Chief Morris stated the attempted PIP would not be placed in Hudson's file and if it was placed in the file against her authority, Hudson's 4-page response shall be attached. This was a concern for Hudson because he noted this his Caucasian colleagues were not subject to such intense and harsh critique and were instead provided support and guidance.

24.    On December 9, 2016, Hudson requested Family Medical Leave Act (FMLA) leave, which HR approved and notified Hudson on January 9, 2016.  Hudson postponed his leave for one week until January 16, 2016 to work with his supervisors and partners in preparation of his leave.

25.    From June 2016 to May 2017, Hudson reported behaviors of micromanagement, invasion of personal space, and unprofessional behavior to management ranging from Hudson's first chair logging into Hudson's voicemail and deleting messages to Hudson's first chair entering Hudson's office and moving Hudson's belongings.

26.    On or around January 20, 2017, Hudson reached out per Jennifer Ballard–Chief of Staff/Chief Diversity Officer's–invitation to share his concerns. Ballard responded to Hudson she had not received a message and instructed Hudson to contact her assistant to schedule to appointment. On January 23, 2017, Hudson contacted Ballard's assistant to follow-up and schedule a meeting. During the meeting Hudson reported to Ballard-Croft the issues Hudson experienced from his supervisors, his colleague's statements and accusations, as well as Hudson's concern that there was a pronounced lack of diversity within the CCSAO.

27.    Specifically, Hudson described how African-American men were made to feel out of place, set up to fail, or pushed out of the job altogether. Hudson also informed Ballard-Croft his supervisors and colleagues often made comments on his physique and accused Hudson of being "aggressive." On January 24, 2017, Hudson met with Ballard and followed up in writing on February 7, 2017, in part:

> Dear Ms. Ballard: Thank for speaking with me on January 24, 2017 regarding the unprofessional and harassing behaviors resulting in a hostile workplace environment. Please update me on the status of your investigation. If a written summary of the harassment, the discussions with management and the subsequent physical and psychological distress, as we previously discussed, would assist you in your investigation, please let me know.

> Also, please advise if I should report the unprofessional and harassing behaviors to our Human Resources office or if your investigation will include partnering with Human Resources.

28.     On or around February 14, 2017, Hudson returned from a HR approved Family Medical Leave Act leave and reported the following to HR:

> At your convenience and in confidentiality, I want to discuss an issue, unrelated to my leave, regarding unprofessional and harassing behaviors resulting in a hostile work environment. Before and during my leave, I have had discussions with management about the behaviors and the subsequent physical and psychological distress.
>
> For one example, on the day you notified me my leave was approved I immediately told supervisors and the response given was, "**I have never had someone take leave like this in my... years of working here.**" I had not brought matters like this to your attention earlier because prior actions leading up to these types of behaviors were to remain "off the record" and to be worked out between myself and the parties. However, after some time has passed and after consulting with a professional counselor, I realize the assistance of human resources is necessary.
>
> My mentors advised me to report the incidents and to request information on our Employee Assistance Program. Please advise.

29.     On March 24, 2017, Hudson followed up with Ballard to determine if she need any additional information from Hudson to continue her investigation. During this time, the harassment Hudson was experiencing continued to increase, as did Hudson resulting stress. Hudson began receiving treatment for stress-induced back pain and was, again, discouraged from exercising his right to take leave for medical treatment. Hudson's supervisor told Hudson to seek treatment, "on his own time." Of note, Caucasian ASAs who took time off for medical or other reasons were treated favorably.

30.     On April 2, 2017, Ballard replied to Hudson stated her assistant would reach out to Hudson to schedule a follow-up meeting at Ballard's downtown office or at Hudson's office in the Juvenile Justice Bureau.

31.     On April 3, 2017, Ballard's assistant, Ms. Bennett, phoned Hudson to schedule

another in-person meeting with Ballard on April 14, 2017.

32.   On April 14, 2017, Hudson met with Ballard and Miller and followed-up with both in writing on April 17, 2017.

33.   On May 15, 2017, Hudson followed-up with Ballard and Miller to inform them of his May 22, 2017 transfer to the Narcotics Prosecution Bureau from the Juvenile Justice Bureau.

34.   Upon Hudson's transfer to Narcotics, it become very clear, very quickly Hudson was not welcome in the Narcotics Prosecution Bureau.

35.   On June 15, 2017, Hudson followed-up with Ballard and Miller to share his enthusiasm of his new assignment.

36.   However, in July 2017 Hudson was essentially demoted within the Narcotics Prosecution Bureau to an administrative position and given no additional training. Hudson continued to experience hostility from co-workers and supervisors alike. Hudson's attempts to receive training and guidance were met with resistance and subjected him to accusations of being "difficult." Similarly situated white and female ASAs were not treated in a similar manner.

37.   On September 15, 2017, Hudson followed-up with Ballard and Miller to schedule meeting and inform them of the leadership roles and extracurricular work Hudson volunteered for within the Narcotics Prosecution Bureau.

38.   On October 13, 2017, Hudson contacted HR Kathy Wallace to review a report of workplace harassment against Hudson. During the same month, Hudson also met with Ballard-Croft to report increasing hostility since his move to the Narcotics Prosecution Bureau. Hudson's report to Ballard-Croft including: a Caucasian colleague calling Hudson out his name using profanity; a supervisor referring to an African-American defendant as a "thug" via e-mail, which Hudson provided to Ballard-Croft; Caucasian colleagues referring to African-American

defendants as "mookies" and "pookies;" and patently false allegations of a Brady violation coupled with an ARDC threat. Hudson made these reports directly to Ballard-Croft and Deputy Chief of Staff Alyson Miller.

39.     On or around October 23, 2017, Kyla Bourne said, "[Petitioner is treated differently because [he is] Black and it's bullsh*t." Hudson responded, "Please tell me why you say this." Kyla Bourne, responded, in summary, "You know this stuff better than any of them and they treat you like you're inferior because you're Black and it's bullsh*t." Hudson replied, "Thank you for speaking up. I feel and have felt the same for a while. This is America, what can or should I do. I just do the best I can and keep my head down and do my work. Thanks a lot for pulling me to the side and sharing your observations."

40.     On or around June 5, 2018, Sue McShane said,

> Oh my God, I am so glad you are out of [the Cook County State's Attorney's Office]. I hated the way they treated you; it made me and everyone else in the room uncomfortable. Especially the woman, what was her name . . . Becky. There were a lot of people in the room when they would berate and belittle you in front of us and it made the room uncomfortable. I would talk to Jesse about how it made us feel.

This comment was made in regards to persistent harassment and belittlement by Becky Walters, Sara Kaufman, Erin Antoinette, Emily Cole, and Jennifer Coleman and witnessed by Susan McShane and Jesse Martinez, co-workers of Hudson. Hudson responded by stating, "I may file an action after speaking with counsel on what impact a lawsuit could have on my career, would you be willing to speak to my attorneys about your observations?" Sue McShane, replied she would speak to Hudson's attorneys on Hudson's behalf. On June 19, 2018, Hudson spoke with Sue McShane, again, who at this time stated she, "did not want to jeopardize her job but would talk to Hudson's attorneys" about how poorly Hudson was treated during his employment.

41.     On or about November 27, 2017, State's Attorney Kim Foxx stated, "I have

received an unprecedented number of workplace harassment and discrimination complaints, to I met with the chiefs of all divisions to address this issue and begin mandatory trainings." This comment was made in regards to the National Black Prosecutors Association conference. Hudson responded by thanking Ms. Foxx for making the statement and informing her of his participation in Foxx's Chiefs of Staff– Jennifer Ballard's–Wednesday Open Office Hours where Hudson reported systematic character attacks and harassment by his co-workers, supervisors, and members of management.

<u>Hudson's Reporting of Discrimination to Human Resources</u>

42.     Hudson made several verbal and written complaints to his local and executive human resources ("HR") representatives regarding harassment, bullying, and threatening behavior by Narcotics Division Chief, Jennifer Walker-Coleman to report Hudson to the Illinois Attorney Registration and Disciplinary Commission (ARDC) for a case Hudson had no verified involvement in litigating or preparing for litigation. Walker-Coleman harassed, interrogated, and threatened Hudson with ARDC charges simply for being assigned to the same courtroom where the case in question was pending. Hudson's Caucasian colleagues, who had actually litigated the case in question, were never questioned at all.

43.     On or about September 29, 2017, Hudson reported Sara Kaufman, after speaking with perpetrator-Kaufman, for harassment and discrimination to her manager, Emily Cole ("Cole"), who in turn conspired with Walker-Coleman to precariously terminate Hudson.

44.     The report Hudson filed regarding Kaufmann resulted in a finding by HR stating, "we have determined that the complained of conduct does constitute unlawful workplace harassment by ASA Kaufman" and ASA Kaufman's conduct "falls short of the CCSAO's expectation that employees conduct themselves at all times in a professional, courteous and

business-like manner." **Exhibit 4**. Exactly seven (7) days later, the CCSAO terminated Hudson. **Exhibit 5**. Of note, the CCSAO prepared Hudson's termination papers three (3) days after HR found Hudson had been subject to workplace harassment and discrimination. Later, Hudson discovered his employment file was padded with a November 8, 2017 PIP Hudson never received while actually employed.

45.     During the time Hudson reported Kaufman, Walker-Coleman attempted to discipline Hudson on October 10, 2017, just six (6) days after Hudson filed his complaint against Kaufman. Walker-Coleman, however, had no documents or examples of Hudson's alleged deficiencies. Again, Walker-Coleman attempted to place Hudson on a PIP, a document Walker-Coleman created just over two weeks after Hudson met with HR to follow up on his October 6, 2017 report of harassment and work-place discrimination.

46.     On October 23, 2017, Hudson received, at work, tampered mail containing his private Explanation of Benefits health insurance information from Supervisor-Emily Cole, cohorts of Kaufman and Walker-Coleman. Hudson was shocked his co-workers had access to mail addressed to Hudson's personal home as the CCSAO changed Hudson's address without his knowledge or consent and someone within CCSAO opened Hudson's confidential health insurance documents.

47.     On October 24, 2017, Kaufman entered Hudson's workspace and spoke with ASAs Chambers, "Gus", Walters and engaged in conversation which Hudson was clearly not welcomed to join.

48.     On October 25, 2017, ASA Walters, a friend of Kaufman, created a more hostile workplace environment when she stated to Hudson, "Your new thing is to question me." Hudson responded, "That is not true, we are partners."

13

49. On October 26, 2017, ASA Walters, a friend of Kaufman, continued to create hostile work conditions when she complained to Hudson and his supervisor stating Hudson was not following protocol. Hudson responded he followed ASA Walters exact e-mail template by typing over the requirements she preferred. When Hudson asked Walters about another case, Walter treated Hudson with hostility and unprofessionalism.

50. On October 27, 2017, ASA Walters, a friend of Kaufman, attended work noticeable uncomfortable and unwelcoming of Hudson. From October 27, 2017 to November 15, 2017 Hudson worked with minimal to no help as many of his counterparts isolated Hudson and would not work with him.

51. On November 16, 2017, ASA Walters, a friend of Kaufman, screamed at Hudson, "I don't have time for this," referring to Hudson's inquiry to Walters concerning a Mental Health Court referral for a defendant.

52. On November 20, 2017, ASA Walter, a friend of Kaufman, yelled at Hudson, "I might scream," in front of Kaufman and continued to accuse Hudson of being unprofessional for sharing deferred prosecution information with a fellow ASA. Of note, Hudson and Kyla Bourne noticed desperate treatment based on demographic variables as it concerned whether a defendant was offered deferred prosecution. Kaufman harassed Hudson for doing his job and sending defendant who qualified to the courtroom Kaufman occupied.

53. In response to Hudson's complaint against Kaufman, HR told Hudson that the complaint about Kaufman had been investigated, and that Kaufman would be subject to undisclosed discipline and cease any harassment, bullying, and/or physical threats. HR told Hudson he should report any retaliation following the report of harassment.

54. Hudson was later informed by management that she was terminated.

55. Upon information and belief, Kaufman was not disciplined for harassing, bullying and verbally threatening Hudson as Hudson observed Kaufman laughing with her supervisor Emily Cole while leaving the Mandatory October 19, 2017 training following Hudson's October 6, 2017 report of harassment, and is still employed as an Assistant State's Attorney at the CCSAO.

56. Kaufman's harassment, bullying, and verbal threats of physical violence towards Hudson continued unabated and increased by Kaufman's colleagues and supervisors for the duration of Hudson's employment.

Rebuttal of Employer's Pretextual Reasons for Hudson's Termination

57. Employer attempts to provide non-discriminatory reasons for Employee's termination, namely, that Employee was not properly fulfilling his duties as Assistant State's Attorney. Specifically, Employer alleges "Unlike his peers, [Petitioner] failed to demonstrate improvement as an attorney in appeals." However, Employee-Hudson received compliments on his competency and work ethic from every judge he assisted as an ASA. Hudson recalls assisting a substitute judge who reached out to Hudson's main judge to compliment Hudson's competency and professionalism. In addition, Hudson received exceptional performance evaluations throughout his career and was formally recognized as an exemplary employee.

58. On Hudson's 2015-2016 review, Supervisor Allen Spellberg wrote, "Brandon's briefs are well written and organized. Brandon is always willing to do anything he is asked to do. He is very efficient and completes his briefs in a timely fashion."

59. On Hudson's 2015-2016 review, Supervisor Allen Spellberg wrote, "Brandon is always professional and polite with all his fellow ASAs and the support staff. Brandon fully prepares for oral argument, knows all the facts of his case and the relevant law and is able to

present his position forcefully to the Appellate Court."

60.     On Hudson's 2015-2016 review, Supervisor Allen Spellberg wrote, "Brandon works hard and is always willing to help others.  He recognizes that he still has much to learn and is constantly seeking out new and challenging assignments.  He has all the makings of a great partner."

61.     On Hudson's 2015-2016 review, Supervisor Allen Spellberg wrote, "Brandon always conducts himself in a professional and ethical manner." and "Brandon works very hard. He is always at his desk early in the morning and works the entire day."

62.     On Hudson's 2016-2017 review, Supervisor Allen Spellberg wrote, "Brandon's briefs are always well researched and persuasively explain why the defendant's arguments should be rejected. He handled many cases during his time in Appeals, including several raising complicated fourth amendment and constitutional issues. With each brief, he was able to prepare a cogent argument as to why the defendant's conviction should be affirmed."

63.     On Hudson's 2016-2017 review, Supervisor Allen Spellberg wrote, as supported by ASAs Cook and Nowak, "Brandon is always willing to do anything he is asked to do. He is very efficient and completes his briefs in a timely fashion."

64.      On Hudson's 2016-2017 review, Supervisor Allen Spellberg wrote, as supported by ASAs Cook and Nowak "Brandon gests along with everyone and always maintains a professional demeanor." and "Brandon is always professional and polite with all his fellow ASAs and the support staff."

65.     On Hudson's 2016-2017 review, Supervisor Allen Spellberg wrote, as supported by ASAs Cook and Nowak, "He takes guidance from his supervisors very well and always follows through."

<u>Respondent Discharged Petitioner in Retaliation for Complaining of Discrimination</u>

66.     Preceding his termination, Hudson was subject to ongoing harassment increasing in severity as a result of complaining to Human Resources regarding discrimination within the Cook County State's Attorney's Office.

67.     On or around August 25, 2015, Assistant State's Attorney Ashley Toro-Behncke said, "How did you get this job? My friend is supposed to be in your place." This comment was made in regards to Toro-Behncke opinion about Hudson being an "affirmative action" hire and witnessed by Hudson and Toro-Behncke. Hudson responded by he interviewed for the position since he was a law student and went through three (3) rounds of intense interviews, presumably like the rest of his peers.

68.     On or around August 27, 2015, ASA Toro-Behncke filed an internal complaint within the Cook County State's Attorney's Office alleging that Hudson was engaged in the unauthorized practice of law. This comment was made in regards to Toro-Behncke general disdain for Hudson based on his race, gender, and work-ethic and witnessed by Supervisors Spellberg, Katz, and Leafblad. Hudson responded by cooperating with the supervisors investigation, which proved Toro-Behncke's allegations were unfounded as a personal attack.

69.     On or around October 1, 2017, Assistant State's Attorney Erin Antonietti filed an internal complaint within the State's Attorney's Office alleging Hudson had a "pattern or practice" of calling defendants on the telephone. This comment was made in regards to ASA John Cooper request to ASA Becky Walters and Hudson to let a defendant know about a deferred prosecution date, which defendant missed by using the restroom during court proceedings and witnessed by ASAs Walters and Antoinette. Hudson responded by stating defendant was never contacted and Supreme Court Rule allows purely administrative contact,

although Hudson never contacted any defendants or represented parties.

70.     On or around September 1, 2016, Assistant State's Attorney Mary Joly Stein filed an internal complaint within the State's Attorney's Office alleging Hudson was a hostile employee.    This comment was made in regards to a white female ASA, Bianca Pucci complaining of Hudson's courtroom demeanor and witnessed by court personnel and Judge. Hudson responded by asking Supervisor-Joly Stein to review the courtroom recordings and speak with courtroom staff to prove Hudson's innocence. Stein declined to investigate per Hudson's request and transferred Hudson to another courtroom where Hudson continued to experience workplace harassment and discrimination.

71.     On December 1, 2017, ASA Mary Joly Stein and Joan Pernecke said, "this is unacceptable" in regards to FMLA granting of medical leave for Hudson.  This statement was witnessed by Juvenile Justice Chief–Tisa Morris, an African-American female who was also later terminated. Hudson responded by stating he informed his supervisors following approval by HR. Hudson was chastised for no legitimate reason by his immediate supervisors for requesting FMLA and was subject to being openly berated, belittled, and questioned on every aspect of Hudson's legal work.

Performance Improvement Plan and Subsequent Discharge

72.     On or about November 2017, Hudson received an unsubstantiated and illegitimate Performance Improvement Plan failing to indicate areas requiring improvement, a timeline for improvement, and devoid of all requirements HR requires for a PIP.  Hudson responded to HR the allegations of workplace deficiency are patently false as they occurred immediately upon reassignment during the course of six (6) months in an environment where Hudson was consistently harassed by all white, female colleagues.

73. Of note, Hudson received a similar pretextual. attempted PIP in 2016 the Juvenile Justice Bureau, which was dismissed as Hudson litigated two (2) cases with over 10,000-pages of discovery per each case with minimal supervision. Hudson received praise from his colleagues and the Court for favorable outcomes for the two cases, which CCSAO supervisors and first-chairs actively avoided accountability.

74. Following the Supervisor Walker-Coleman's failed attempt to place Hudson on a PIP, in the Narcotics Prosecution Bureau, Hudson suffered continued harassment from his co-workers, supervisors, and members of management.

75. Clarify the discharge. The CCSAO ultimately discharged Hudson on a Monday, December 4, 2017, about two hours into the workday when Supervisor Walker-Coleman called Hudson to her office. Walker-Coleman stated, " It was not working out for Hudson and he could go home."

76. Subsequent to being harassed at work and CCSAO's termination of Hudson's employment for reporting said race, gender, retaliation to HR, Hudson has been diagnosed with post-traumatic stress disorder ("PTSD"), high blood pressure, and depression with the diagnosis specifying causation based on hostile work place conditions. Prior to working for CCSAO, Hudson had no pre-existing conditions of the aforementioned diagnoses. Subsequent to termination, Hudson sought assistance from the Lawyer's Assistance Foundation ("LAF") as he continued to suffer PTSD, depression, and high blood pressure.

77. Hudson has been diligently seeking fulltime employment subsequent to his termination from the Cook County State's Attorney's Office. Hudson even reached out to an employer who offered to pay him eighty-five thousand dollars ($85,000) starting November 20, 2017–just weeks prior to CCSAO's wrongful termination of Hudson. **Exhibit 6**. Unfortunately,

the recruiter told Hudson the position was "filled by the second-best candidate." Presently, Hudson performs court coverage for solo-practitioners, which provides Hudson unstable, sporadic income. Hudson also qualified for Illinois unemployment insurance, which the CCSAO vehemently fought by hiring NSN Employer Services, Inc. and filing bad faith, fraudulent claim of "Issue 004 602A - Misconduct" against Hudson.

78. However, NSN Employer Services, Inc. withdrew from representing the CCSAO or failed to prosecute the CCSAO's allegations when Hudson filed a 46-page response stating, in part:

> It has come to [Hudson's] attention that, since [Hudson] filed an Equal Employment Opportunity Commission (EEOC)/Illinois Department of Human Rights (IDHR) charge, the Cook County State's Attorney's Office (CCSAO) has made the decision to challenge claimant's right to receive unemployment benefits whereas the CCSAO had not previously." The CCSAO's untimely decision–change of heart–to pursue a challenge of claimant's benefits is likely motivated by the CCSAO's retaliative disposition triggered by claimant pursuing protected activity: filing an EEOC charge against the CCSAO on June 1, 2018. *See Wright v. Life Start Ctrs., Inc., 2000 U.S. Dist. LEXIS 16424, at \*8-9* (N.D. Ill.); *Steele v. Shafer, 535 F.3d 689, 696* (D.C. Cir.) (reversal of a denial of retaliation claim because the court did not consider the employer's opposition to unemployment as retaliatory conduct).
>
>           \*             \*             \*
>
> Claimant also brings to the Honorable ALJ's attention the appeal is untimely as employer-appellant filed the appeal around June 27, 2018–nearly five (5) months after the January 26, 2018 Determination in favor of the claimant. The employer-appellant filed the appeal well beyond thirty (30) days after the January 26, 2018 Determination.
>
>           \*             \*             \*
>
> The appeal is untimely and meritless. The untimeliness should guide the ALJ to deny appellate review of the employer-appellant's appeal. *See 820 ILCS 405/800*; *820 ILCS 405/702*; *56 Ill. Adm. Code 2720.200*; *56 Ill. Adm. Code 2720.130*. Should the ALJ address employer-appellant's claim, the ALJ should find employer-appellant's claim, amongst other things, is utterly meritless after a review of the overwhelming evidence. *See 820 ILCS 405/602A* and *601A*.

Hudson prevailed and his unemployment claim remained open.

The CCSAO also knowingly provided false information and withheld information during the federal investigation, Hudson's EEOC charges. Specifically, the CCSAO stated, in bad-faith, Hudson, "Unlike his peers, [Employee] failed to demonstrate improvement as an attorney in appeals." The CCSAO's statement was neither truthful, candid, nor diligent as the CCSAO rated Hudson highly in two (2) yearly performance reviews, which the CCSAO never mentioned or filed with the EEOC in its response. The CCSAO also filed to inform the EEOC of its internal investigation where the CCSAO found Hudson was, in fact, subject to workplace harassment and discrimination while employed at the CCSAO and just one (1) week after the CCSAO terminated Hudson.

## COUNT I
## HOSTILE WORK ENVIRONMENT BASED ON GENDER DISCRIMINATION VIOLATION OF TITLE VII CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et seq.*

79.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78, as if fully set forth herein.

80.     The actions of the Cook County State's Attorney's Office as perpetrated by its agents and as described and complained of above are unlawful employment practices in that they have the effect of discriminating against and creating a hostile work environment through gender discrimination, in violation of Title VII.

81.     At all times relevant to this cause of action, the Cook County State's Attorney's Office had a duty under Title VII to refrain from discriminating against, harassing, retaliating against, and permitting a hostile work environment for Plaintiff based on his gender.

82.     Plaintiff was harassed on an almost daily basis by employees of the Cook County State's Attorney's Office.

83. Plaintiff reported the harassment on multiple occasions to management and human resources. Despite this, the Cook County's State's Attorney's Office did not take any action to investigate, remediate, stop, prevent, or otherwise address the gender discrimination and hostile work environment.

84. Cook County State's Attorney's Office's inaction caused the gender discrimination and hostile work environment to continually escalate, eventually leading to Plaintiff's need to report and subsequent retaliatory discharge.

85. The hostile work environment Plaintiff was subjected to was so severe and pervasive that it unreasonably interfered with his work performance, altered the conditions of his employment, and created an abusive working environment.

86. The discriminatory actions by the Cook County State's Attorney's Office, through its management agents and employees, were intentional and willful, and in deliberate disregard of, and with reckless indifference to, the federal laws, state laws, and the rights and sensibilities of Plaintiff.

87. Cook County State's Attorney's Office, by and through its agents, engaged in the foregoing acts and conduct when it knew or should have known that the same were in violation of Title VII and any alleged reasons to the contrary are pretextual.

88. There is a connection between the Plaintiff's gender and the dissimilar treatment suffered by Plaintiff at the hands of the Cook County State's Attorney's Office.

89. Based on the gender discrimination, hostile and abusive work environment and retaliation, Plaintiff was placed on PIP and subsequently terminated.

90. The discriminatory actions by the Cook County State's Attorney's Office were intentional and willful, and in deliberate disregard of, and with reckless indifference to, the

federal laws, state laws, and the rights and sensibilities of Plaintiff.

91.     The actions of the Cook County's State's Attorney's Office against Plaintiff caused him great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of professional reputation, lost wages and benefits, future pecuniary losses, and other consequential damages.

**COUNT II**
**HOSTILE WORK ENVIRONMENT BASED ON RACIAL DISCRIMINATION**
**VIOLATION OF TITLE VII CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e,** *et seq.*

92.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78, as if fully set forth herein.

93.     The actions of the Cook County State's Attorney's Office as perpetrated by its agents and as described and complained of above are unlawful employment practices in that they have the effect of discriminating against and creating a hostile work environment through racial discrimination, in violation of Title VII.

94.     At all times relevant to this cause of action, the Cook County State's Attorney's Office had a duty under Title VII to refrain from discriminating against, harassing, retaliating against, and permitting a hostile work environment for Plaintiff based on his race.

95.     Plaintiff was harassed on an almost daily basis by employees of the Cook County State's Attorney's Office.

96.     Plaintiff reported the harassment on multiple occasions to management and human resources.  Despite this, the Cook County's State's Attorney's Office did not take any action to investigate, remediate, stop, prevent, or otherwise address the racial discrimination and hostile work environment.

97.     Cook County State's Attorney's Office's inaction caused the racial discrimination

and hostile work environment to continually escalate, eventually leading to Plaintiff's need to report and subsequent retaliatory discharge.

98.     The hostile work environment Plaintiff was subjected to was so severe and pervasive that it unreasonably interfered with his work performance, altered the conditions of his employment, and created an abusive working environment.

99.     The discriminatory actions by the Cook County State's Attorney's Office, through its management agents and employees, were intentional and willful, and in deliberate disregard of, and with reckless indifference to, the federal laws, state laws, and the rights and sensibilities of Plaintiff.

100.    Cook County State's Attorney's Office, by and through its agents, engaged in the foregoing acts and conduct when it knew or should have known that the same were in violation of Title VII and any alleged reasons to the contrary are pretextual.

101.    There is a connection between the Plaintiff's race and the dissimilar treatment suffered by Plaintiff at the hands of the Cook County State's Attorney's Office.

102.    Based on the racial discrimination, hostile and abusive work environment and retaliation, Plaintiff was placed on PIP and subsequently terminated.

103.    The discriminatory actions by the Cook County State's Attorney's Office were intentional and willful, and in deliberate disregard of, and with reckless indifference to, the federal laws, state laws, and the rights and sensibilities of Plaintiff.

104.    The actions of the Cook County's State's Attorney's Office against Plaintiff caused him great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of professional reputation, lost wages and benefits, future pecuniary losses, and other consequential damages.

## COUNT III
## RETALIATION FOR EXERCISE OF RIGHTS UNDER TITLE VII CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e

105.　Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78, as if fully set forth herein.

106.　Plaintiff complained of ongoing and repeated racial and gender discrimination and hostile work environment.

107.　In retaliation to Plaintiff's complaints, reports, and protests of sexual harassment and a hostile work environment, the Cook County State's Attorney's Office terminated Plaintiff's employment.

108.　At all relevant times herein, Plaintiff was performing all of his job duties in a manner that met or exceeded Cook County State's Attorney's Office's legitimate business expectations.

109.　The discriminatory actions by Cook County State's Attorney's Office were intentional and willful, and in deliberate disregard of, and with reckless indifference to, the federal laws, state laws, and the rights and sensibilities of Plaintiff.

110.　Cook County State's Attorney's Office retaliated against and caused constructive discharge of Plaintiff when it knew or should have known that the same were in violation of Title VII and any alleged reasons to the contrary are pretextual.

111.　The actions of Cook County State's Attorney's Office in retaliating against Plaintiff caused her great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of professional reputation, lost wages and benefits, future pecuniary losses, and other consequential damages.

## PRAYER FOR RELIEF

As a proximate result of the foregoing facts, Plaintiff has suffered loss of past and future wages and bonuses, the value of lost past and future benefits, incidental damages, and pain and suffering in the form of emotional distress, anxiety, inconvenience, loss of enjoyment of life, loss of status and self-esteem.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

A. Grant Plaintiff a permanent injunction enjoining Defendants, its agents, successors, employees, attorneys, and those acting in concert with Defendants and at Defendants' request, from continuing to violate Title VII;

B. Grant Plaintiff compensatory and punitive damages, including damages for emotional distress, in an amount to be determined at trial;

C. Grant Plaintiff all lost wages, past and future, to which he is entitled;

D. Grant Plaintiff punitive damages in an amount to be determined at trial;

E. Grant Plaintiff damages based on Defendant's tortious interference with a contract whereas Plaintiff had an agreement with both the State of Illinois and Department of Justice for Student Loan Forgiveness; and

F. Grant Plaintiff such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees, and interest.

**DEMAND FOR TRIAL BY JURY**

Plaintiff requests a jury trial on all issues of fact and law raised by the allegations in this

Complaint.


Dated: December 17, 2018                     Respectfully Submitted,

                                             COLE SADKIN, LLC

                                             By: /s/ Mason S. Cole

Cole Sadkin, LLC
Mason S. Cole
20 S. Clark Street, Suite 500
Chicago, IL 60603
colesadkin.com
(312) 548-8610
mcole@colesadkin.com
*Counsel for Plaintiff*